## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

**JERRY R. KECK,**

                    **Plaintiff,**

    **vs.**

**ANDREW SAUL,[1] Commissioner of Social Security;**

                    **Defendant.**

**8:18CV476**

**MEMORANDUM AND ORDER**

This matter is before the Court on the Motion for an Order Reversing the Commissioner's Decision, ECF No. 13, filed by Plaintiff Jerry R. Keck, and the Motion to Affirm Commissioner's Decision, ECF No. 17, filed by Defendant Andrew Saul ("Commissioner"). On October 22, 2019, the Court entered an Order holding its decision in abeyance pending the Eighth Circuit's decision in *Thurman v. Comm'r*, No. 18-3451. The Eighth Circuit's decision was issued on June 26, 2020. For the reasons stated below, the Motion for an Order Reversing the Commissioner's Decision will be denied and the Motion to Affirm Commissioner's Decision will be granted.

## PROCEDURAL HISTORY

On October 26, 2015, Keck applied for disability insurance benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401, et seq., and supplemental security

---

[1] Plaintiff originally named Nancy A. Berryhill, Acting Commissioner of Social Security, as the Defendant in this action. Andrew Saul became the Commissioner of Social Security in June 2019 and has been automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

1

income benefits under Title XVI of the Act, 42 U.S.C. § 1381, et seq. Tr. 13.[2] In both applications, Keck alleged disability beginning August 31, 2015. *Id.* His claims were denied initially on February 10, 2016, and again on reconsideration on July 11, 2016. *Id.* At Keck's request, a hearing was held on March 7, 2018. *Id.* The Administrative Law Judge (ALJ) issued a written opinion denying benefits on April 5, 2018. Tr. 24.

An ALJ follows a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a); 20 C.F.R. § 416.920(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. *See* 20 C.F.R. § 404.1520(a); 20 C.F.R. § 416.920(a).

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i), (b); 20 C.F.R. § 416.920(a)(4)(i), (b). The ALJ found that Keck met the insured status requirements of the Act through March 31, 2019, and he had not engaged in substantial gainful activity since August 31, 2015, the alleged onset date. Tr. 15-16.

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii), (c); 20 C.F.R. § 416.920(a)(4)(ii), (c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." 20 C.F.R. § 404.1520(a)(4)(ii), (c); 20 C.F.R. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last

---

[2] Pinpoint citations to the transcript of the Administrative Record, ECF No. 10, ("Tr.") shall be to the consecutively numbered pages in the record rather than to the Page ID of the docket.

for a continuous period of at least 12 months."); *see also* 20 C.F.R. § 416.909. Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "[c]apacities for seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations;" and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1522(b); 20 C.F.R. § 416.922(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c); 20 C.F.R. § 416.920(a)(4)(ii), (c). The ALJ found that Mr. Keck had the following severe impairments: degenerative disc disease of the lumbar spine and obesity. Tr. 16.

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. Part 404, Subpart P, App'x 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926); 20 C.F.R. § 416.920(a)(4)(iii). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d); 20 C.F.R. § 416.920(a)(4)(iii), (d). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. *See* 20 C.F.R. § 404.1520(a); 20 C.F.R. § 416.920(a). The ALJ found that Keck did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 19.

Step four requires the ALJ to consider the claimant's residual functional capacity[3] ("RFC") to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." *See* 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f); 20 C.F.R. § 416.920(a)(4)(iv), (e), (f). If the claimant can perform past relevant work, the ALJ will find the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f); 20 C.F.R. § 416.920(a)(4)(iv), (f). The ALJ found that Keck had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and § 416.967(a) except:

> he can never crawl or climb ladders, ropes, or scaffolds; he can occasionally climb ramps and stairs, balance, stoop, kneel, and crouch; he should not be exposed to hazards, such as unprotected heights and moving mechanical parts; and he can sit for 20-30 minutes at one time, after which he would need to stand for up to five minutes, but would be able to remain at the work station and remain productive during that time.

Tr. 19. The ALJ determined Keck was able to perform past relevant work as a computer programmer and that this work does not require the performance of work-related activities precluded by Keck's RFC. Tr. 23. Because the ALJ found Keck to be not disabled at step four, it was not necessary for the ALJ to move to step five.

On August 10, 2018, the Appeals Council denied review, and the ALJ's decision stands as the Commissioner's final decision. Tr. 1. On October 9, 2018, Keck filed a Complaint requesting judicial review of the agency decision. Compl., ECF No. 1.

## FACTUAL BACKGROUND

### I.    *Relevant Medical Evidence*

---

[3] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).

August 31, 2015, was Keck's alleged onset date of disability. Tr. 13. He protectively filed for benefits on October 26, 2015. *Id.* He claimed disability benefits due to a herniated disc, anxiety, migraines, and kidney issues. Tr. 245.

On November 9, 2015, Keck saw Dr. Michael Sedlacek, M.D., a psychiatrist, for evaluation of his depression and anxiety and management of his psychiatric medications. Tr. 469. Recent kidney issues were a current stressor. *Id.* Keck reported feeling fatigued and chronic back pain. *Id.* Dr. Sedlacek diagnosed generalized anxiety disorder and dysthymia and prescribed Prozac. Tr. 471.

On November 10, 2015, Keck completed a pain questionnaire and a headache questionnaire. Tr. 257-60; Tr. 263. On November 12, 2015, Jackie Aerts completed a third-party function report concerning Keck's activities and limitations. Tr. 273-75.

On January 7, 2016, Keck underwent consultative examinations.

On January 19, 2016, Keck saw Dr. Keith Lodhia, M.D., for evaluation of his chronic back pain. Tr. 477-78. Keck was experiencing discomfort which radiated pain down his right leg into his toes, which was improved with lying down and icing, and was aggravated by standing or sitting too long. Tr. 477. Injections in 2013 had provided some benefit. *Id.* Dr. Lodhia reviewed a 2013 MRI which "did show some multilevel degenerative changes throughout." *Id.* On exam, Keck had "4/5 strength bilaterally" in his hips and "a completely absent S1 reflex on the right." *Id.* Dr. Lodhia diagnosed right leg radiculopathy and determined the right paracentral disc protrusion showing moderate displacement of the traversing S1 nerve root in the 2013 MRI had become more symptomatic. Tr. 478; see Tr. 334-35 (2013 MRI showing "central to right paracentral disc protrusion measuring up to 8 x 4 mm results in moderate mass effect with posterior

5

displacement of the traversing S1 nerve root on the right" at the L5-S1 level)). Dr. Lodhia ordered a new MRI; planned for epidural steroid injections following the MRI; and noted: "Certainly if this does grow worse or he is failing conservative treatment measures we can discuss on a more profound basis about surgical intervention involving microendoscopic discectomy." Tr. 478.

On January 19, 2016, the MRI was performed and showed degenerative changes that correlated with L5, L2 and L3 radiculopathy. *See* Tr. 479-80. On January 26, 2016, Dr. Lodhia reviewed the MRI and explained it showed evidence of a protrusion at L5-S1 with an S1 abutment like the 2013 MRI, but that "did not appear to be mentioned on the new study." Tr. 504. Dr. Lodhia referred Keck to Dr. James Devney, D.O., to try injections. *Id.* On January 26, 2016, Keck saw Dr. Devney, concerning the radiating low back pain. Tr. 524. Keck reported his current pain was 4 out of 10 and occurred daily, and was worsened by, *inter alia*, sitting. *Id.* Keck was tender to palpation over the L5 and S1 spinous process and over the right sciatic notch. Tr. 525. Keck had altered sensation to light touch over the right dorsolateral foot. Tr. 526. He had a positive sitting straight leg raise test on the right. *Id.* He had difficulty with toe and heel walking. *Id.* Dr. Devney noted: "He denies focal lower limb weakness, although admits to a generalized sense of right lower limb muscular fatigue with ambulation greater than one block." *Id.* Dr. Devney noted Keck was a good candidate for a lumbar epidural steroid injection, but his insurance would require a short course of land-based physical therapy first. *Id.* Following that—which apparently was not considered likely to be successful—Dr. Devney planned "for a fluoro-guided and targeted right S1 selective transforaminal epidural." *Id.* Keck was a bit disappointed that the recommended treatment was being deferred for insurance reasons

6

but was willing to undergo the trial of physical therapy with an open mind. *Id*. He underwent the physical therapy. Tr. 575; Tr. 573.

On February 10, 2016, Keck returned to Dr. Devney, indicating that his pain was at 9 out of 10. Tr. 528. Dr. Devney noted: "Unfortunately, it appears that therapy has provoked his pain. Jerry can barely stand." Tr. 530. Dr. Devney sought authorization for a caudal epidural steroid injection at the L5-S1 level and prescribed Ultram for the interim. *Id*. On February 16, 2016, Keck returned to Dr. Devney and received a caudal epidural steroid injection at the L5-S1 level. Tr. 532. On February 23, 2016, Keck returned to Dr. Devney again. Tr. 534. Dr. Devney noted: "Unfortunately, Jerry failed to respond to a fluro-guided lumbar epidural one week ago. His right S1 distribution remains problematic and recalcitrant to conservative therapeutics. I have suggested that he follow up with Dr. Keith Lodhia at this point in surgical consideration." Tr. 536.

Keck returned to Dr. Lodhia on March 2, 2016, and Dr. Lodhia recommended surgery. Tr. 505-06. On March 16, 2016, Keck was cleared for surgery. Tr. 513-17. On March 21, 2016, Dr. Lodhia performed a right L5-S1 minimally invasive microendoscopic discectomy and microdissection. Tr. 489.

On March 25, 2016, Keck completed a disability report explaining his condition had worsened and he had surgery since his prior disability report. Tr. 281.

On April 6, 2016, Keck saw Dr. Eugene Oliveto, M.D., for a psychiatry appointment. Tr. 543-45. On April 12, 2016, Keck returned to Dr. Lodhia. Tr. 552. Keck reported that when lying in bed his pain was 1-2 along the right side lateral and posterior aspect of his leg and when his pain was at its worst it was generally an 8 to 9 out of 10. *Id*. Activity increased discomfort. *Id*. Dr. Lodhia prescribed a Medrol Dosepak and physical therapy

7

and explained "there was no guarantee of benefit from the surgical intervention regarding the numbness or tingling in the S1 distribution due to the duration of disk herniation he had." Tr. 553.

On July 8, 2016, an agency nonexamining psychologist provided opinions concerning Keck's mental limitations. Tr. 570.

On August 9, 2016, Keck completed a disability report explaining his pain was "worse than before I had surgery" with "pain shooting down my leg when I move around" and explained his pain also woke him up in the night. Tr. 294.

On April 6, 2017, Keck saw Dr. Arun Patil, M.D., concerning his low back pain that shot down to his buttock on his right side, and sometimes down to his right foot. Tr. 677. Keck could not walk on his heels or toes and complained of muscle atrophy in his thighs. *Id.* Dr. Patil planned an EMG. *Id.* On May 11, 2017, Keck began primary care with Dr. Kristee Zoloty, D.O. Tr. 609. Dr. Zoloty prescribed Norco, Elavil, and Ativan. Tr. 611.

On June 2, 2017, Keck saw Dr. Wesley Smeal, M.D., a physiatrist. Tr. 588. Dr. Smeal described in detail Keck's history of back pain and treatment that started in 2011. *Id.* Dr. Smeal noted Keck had some improvement after his March 2016 surgery, "but then shortly thereafter sx got aggravated and increase in pain, to where some fairly consistent moderate pain." *Id.* The recommended EMG had not yet been completed. *Id.* Manual muscle strength testing showed "5-/5 in the proximal R LE while seated; 4-/5 with PF and 4+/5 with DF" and a gait that favored the right leg. Tr. 590. Dr. Smeal prescribed Mobic and aquatic physical therapy, ordered a lumbar spine MRI, and agreed with a plan for a bilateral leg EMG. Tr. 591. On June 8, 2017, the MRI was performed on Keck's lumbar spine. Tr. 606-07. Findings included: "Small right paracentral nonenhancing disc

extrusion with downward migration at the L5-S1 level abuts and dorsally displaces the right S1 nerve root." Tr. 607.

On July 20, 2017, Keck saw Dr. Zoloty for primary care. Tr. 613-16. On July 28, 2017, a CT scan of Keck's abdomen showed severe hepatomegaly and moderate splenomegaly and hepatic steatosis. Tr. 637.

On August 11, 2017, Keck returned to Dr. Smeal. Tr. 592. Keck reported some improvement with mobility, but not with pain, after aquatic therapy. *Id.* The EMG had still not been performed. *Id.* Keck explained he would be seeing a GI specialist concerning his enlarged liver and spleen. *Id.* Dr. Smeal noted after reviewing the recent MRI: "consider R S1 TFESI with x-ray guidance" and urged Keck to be cautious with lifting and body mechanics and continue activities as tolerated. Tr. 595. On August 28, 2017, Keck saw Dr. Robert Kizer, M.D., concerning his enlarged liver and spleen. See Tr. 653-58. On September 20, 2017, Keck returned to Dr. Smeal. Tr. 596. He explained his symptoms were about the same. Tr. 597. Keck reported some relief with medication. Tr. 673. He had attempted to clean, paint, and re-install cabinets, but that increased his symptoms. Tr. 597. Dr. Smeal discussed the epidural steroid injection and discussed following up with Dr. Lodhia concerning a possible fusion surgery. Tr. 600.

Keck saw Dr. Zoloty for primary care on October 10, and December 20, 2017. Tr. 617 (preop for liver biopsy for hepatosplenomegaly, noted continued back pain); Tr. 621 ("He's having depression because of his chronic back pain and can't do anything. He states he's been on numerous medications in the past and nothing has helped."). Dr. Zoloty referred Keck back to "CHI neurosurgery" for evaluation to see if he was a surgical candidate. Tr. 624.

## II.      Treating and Examining Opinions

On January 7, 2016, Keck saw Dr. Holly Filcheck, Ph.D., for a psychological consultative examination. Tr. 345. Dr. Filcheck generally indicated Keck would have no difficulties with social functioning, completing tasks, carrying out simple instructions, working with coworkers and supervisors, and adapting to changes. Tr. 347. Dr. Filcheck also noted: "There appear to be recurrent episodes of deterioration when stressed as his symptoms increase." Tr. 347.

On January 7, 2016, Keck saw Dr. Brian Hollis, M.D., for a physical consultative examination. Tr. 645. Dr. Hollis observed Keck walking with very short measured steps. Tr. 648. Keck did not appear to have significant discomfort, but he said that after sitting for 10-15 minutes, he started to have some pulling in his right buttock area. *Id.* Dr. Hollis stated that Keck had mildly decreased sensation in his right foot, symmetric reflexes, and negative straight leg raising. Tr. 649. Dr. Hollis stated that Keck had no significant tenderness in his lumbar spine and mild tenderness in the right buttock. *Id.* Keck had "no significant lumbar back pain or paraspinous muscle tenderness." *Id.* Keck had normal range of motion in his shoulders, elbows, hands, and knees, and full grip and upper extremity muscle strength Tr. 644. Dr. Hollis diagnosed, inter alia, chronic back pain with radiculopathy. Tr. 650. Dr. Hollis predicted: "At this time, I do not suspect what he will have significant improvement without an intervention." Tr. 650. Dr. Hollis did not think Keck could return to work as a roofer. *Id.* Dr. Hollis noted: "The patient may be able to tolerate some sort of very light duty with frequent rests and/or breaks." Tr. 651.

On February 12, 2018, Dr. Smeal provided his treating opinions as to Keck's work limitations. Tr. 673. Dr. Smeal described his treatment history. Tr. 673-74. Dr. Smeal

10

explained Keck would be limited to standing no more than 2 hours in an 8-hour day. Dr. Smeal explained: "the patient would benefit from changing positions at least every 45 minutes. If symptoms flare up, he may need to change positions more than that." Tr. 674. In response to the question, "when your patient changes positions, must he walk for approximately 5 minutes before he is able to sit again?" *Id.* Dr. Smeal responded: "I would recommend he change positions as needed for comfort. I would recommend he get out of a sitting position at least once every 45 minutes and it would be best to walk and move around for 3-5 minutes on each of those occasions." *Id.* Dr. Smeal also stated that "Avoiding prolonged sitting or standing [may be] beneficial." *Id.* Dr. Smeal explained that reclining while seated or lying down for a few minutes may provide relief for symptoms, but it is not clear whether that was intended to be a work limitation. See Tr. 674.

### III.    Administrative Hearing Testimony

On March 7, 2018, the ALJ held Keck's hearing. Tr. 31. Keck said his past work ended when he could no longer perform it. Tr. 37- 38. He explained what kept him from working:

> My back. I can't sit for -- in a normal chair for more than, you know, most of the time, more than 20 minutes, a half hour without it starting to bother me. I tried, I tried modifying with -- you know, I've got cushions at home and, you know, tried all kinds of different things, moving my feet out sometimes will give me a little longer duration, but even towards the end of my estimating, I tried to make sure I didn't stay in my chair more than a couple of hours, and I'd get up and walk around the building if it was nice out or whatever, and then as the day went on, I would have to do that more and more frequently and take longer breaks and then, fortunately, most of the rest of the people started -- you know, it was a roofing company, so most of the rest of the people started even earlier than I did, so the office would be empty at the end of the day, and a lot of days, I was in so much pain, I'd just be leaning on my desk at the end of the day, like, you know.

Tr. 39-40. Keck said after sitting for "20, 30 minutes or so" he needed to stand up for at least five minutes. Tr. 40. He explained he used to walk around the building for about 10

11

minutes and then sit down to work for another 20 to 30 minutes. *Id*. He said pain pills made him "really sleepy and groggy" and he would need to take them if he tried to sit for 20 to 30 minutes and then stand for five minutes and repeat that throughout the day. Tr. 40-41. Keck said he tried to get all the things he needed to do in a week done in one day, because after doing the activities he would need to take pain pills for the rest of the day, and he preferred to take pain pills on one day instead of several days. *See* Tr. 41.

Keck explained he could stand for five minutes without support and up to 20 minutes if he leaned against something. Tr. 42. He did not walk far and used a cane for ambulation. Tr. 42-43. He said he could lift "30, 40 pounds" but could only carry 20 pounds at most. Tr. 43. Any kind of activity made his pain worse. Tr. 45.

For current treatment, Keck was in physical therapy and prescribed hydrocodone for pain. Tr. 43-44. He had insurance difficulties. Tr. 44.

Keck said his treatment for his kidneys and liver was not currently affecting his ability to work. Tr. 45-46. His legs swelled at one point but improved. Tr. 46. He said he developed anxiety during his past work as a computer programmer. Tr. 46-47. Usually lorazepam would calm him, but he had a few panic attacks. Tr. 47. Keck said the anxiety was difficult to live with, "but it's my back that's keeping me off of working right now." *Id*. His primary care physician managed his psychiatric prescriptions. Tr. 48. When stressed, Keck had difficulty concentrating. Tr. 48-49.

Keck said he spent most of his day in a recliner. Tr. 55. He said he could not perform his past computer job anymore because:

> I can't sit. I haven't been able to figure out a way to sit in an upright chair for any more than, you know, like I said before, usually 10, 20 minutes. I mean I still have to sit on my computer to get online forms for the County and, you know, some other things, you know, Social Security, stuff like that, and I still

get on there to read the news and stuff sometimes and 20 minutes is about
all I can get.

Tr. 57-59. Keck stood up to walk around before the vocational expert testimony began.
*Id.*

The ALJ's first hypothetical followed the "[Disability Determination Services] at sedentary" RFC determinations and asked the vocational expert to consider a person with Keck's age, education, and employment history.[4] See Tr. 61. The ALJ further limited the hypothetical to a person who could occasionally perform some postures, never do others, and was unable to work around hazards such as unprotected heights or moving mechanical parts. *Id.* The vocational expert stated Keck's past relevant work as an estimator would be available only as generally performed and Keck's work as a computer programmer would be available as performed and as generally performed. Tr. 61-62. The ALJ then added a sit-stand option such that "a person could sit for 20 to 30 minutes and stand for up to 5 minutes during which time they could remain at their workstation and productive" which did not impact the vocational expert's conclusion that both past jobs would be available. Tr. 62.

The vocational expert said Keck's past relevant work did not produce transferable skills to semi-skilled employment. Tr. 63. The ALJ questioned the vocational expert further on transferability and the vocational expert again explained there would be no transferable skills. See TR 64-65.

---

[4] Keck was born in 1960. Tr. 206. He has at least a high school education and is able to communicate in English. *See* Tr. 246.

13

The vocational expert said one absence per month, 10 percent of time off task and one additional 15-minute break per day each would be authorized. Tr. 63.

Keck's attorney then asked the vocational expert to consider how a need to "walk and move around for three to five minutes" instead of the "stand at the workstation" limitation would impact his prior testimony. See TR 65-66. The vocational expert said the change would preclude performance of Keck's past work because he could not be productive while walking to other locations and moving around. Tr. 66.

At the close of the hearing, Keck again explained why he could not perform his past work:

> Just a general -- that I don't see where I could do either of those jobs right now. You know, the roofing, well, obviously, I can't get up and down on the roofs and I can't, you know, be at a desk for eight, nine hours a day, you know, in my current condition. I have, you know, I'm hoping, maybe my doctors can get me back to the point -- they've said some of the damage is permanent but that doesn't mean they can't get me back to the point where I can go back to work, $1,600 a month is not a lot to live off of. I make a heck of a lot more than that programming, but I can't do it right now. That's all I can say.

Tr. 67.

## STANDARD OF REVIEW

"When considering whether the ALJ properly denied social security benefits, [the Court] determine[s] whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (quoting *Lowe*, 226 F.3d at 971). "Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the conclusion." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (citation omitted). A decision supported by substantial evidence may not be reversed,

"even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (citation omitted). Nevertheless, the Court's "review extends beyond examining the record to find substantial evidence in support of the ALJ's decision." *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) (quoting *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007)). The Court must "also consider evidence in the record that fairly detracts from that decision." *Id.* (quoting *Cox*, 495 F.3d at 617).

The Court also must determine whether the Commissioner's decision "is based on legal error." *Collins*, 648 F.3d at 871 (quoting *Lowe*, 226 F.3d 971). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (citing *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003); *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983)). No deference is owed to the Commissioner's legal conclusions. *Brueggemann*, 348 F.3d at 692 (stating that allegations of legal error are reviewed de novo).

## DISCUSSION

Keck argues that the ALJ's decision should be reversed because 1) the ALJ did not provide good reasons for the lack of weight afforded to the treating physician opinion of Dr. Smeal and to Keck's subjective allegations of limitations, and 2) the ALJ was an inferior officer not appointed in a constitutional manner, which requires the ALJ's decision to be vacated and Keck's claim remanded to be decided by a new ALJ who was properly appointed.

## I.  ALJ's reasons for weight given to Dr. Smeal's opinion and Keck's subjective allegations of limitations

15

Keck argues that, had the ALJ provided the proper weight to Dr. Smeal's opinions and Keck's subjective allegations of limitations, the ALJ's residual functioning capacity analysis would have incorporated the limitation that Keck's breaks from sitting must include walking around for three to five minutes, as opposed to standing and continuing to be productive. Thus, the ALJ would have found Keck unable to perform his past work as a computer programmer. Alternatively, Keck agues his claim should be remanded for additional proceedings as the ALJ's decision denying his claim was not supported by substantial evidence.

"The ALJ must determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own descriptions of [her] limitations." *Gann v. Berryhill*, 864 F.3d 947, 951 (8th Cir. 2017) (quoting *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003)). The ALJ decided this case at step four of the five-step sequential evaluation. "It is claimant's burden to establish [his] RFC at step four." *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004) (citation omitted). The ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8P, 1996 WL 374184 (July 2, 1996).

The ALJ found that Keck "has the residual functioning capacity to perform sedentary work" subject to specific limitations. Tr. 19. One of those limitations was that Keck "can sit for 20-30 minutes at one time, after which he would need to stand for up to 5 minutes, but would be able to remain at the workstation and remain productive during that time." *Id*. The vocational expert testified that, despite these restrictions, Keck's past employment would be available. Tr. 62. However, in response to a hypothetical posed by

16

Keck's attorney, the vocational expert testified that if every 20 to 30 minutes Keck "had to move around and walk to other locations, the probability of him being productive would be very small" thus precluding competitive employment. Tr. 66.

### A.  Weight afforded to Dr. Smeal's opinion

"[A] treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (internal citations omitted) (quoting *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005)). "A treating physician's opinion do[es] not automatically control, since the record must be evaluated as a whole." *Id.* (internal quotations omitted) (quoting *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir.1995)). "An ALJ may 'discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Id.* (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir.2000)). If a treating physician's opinion is not entitled to controlling weight, the ALJ considers the examining and treating relationship, length of treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability, consistency with the record as a whole, and specialization in deciding the weight to give the opinion. 20 C.F.R. § 404.1527(c)(1-6); 20 C.F.R. § 416.927(c)(1-6).

When considering Keck's RFC, the ALJ acknowledged Dr. Smeal was Keck's treating provider and gave significant weight to his medical source statement. However, the ALJ declined to give weight to Dr. Smeal's speculation that Keck "may find reclining

while seated or lying down for a few minutes may give him some relief of his symptoms."
Tr. 22. The ALJ explained that this statement was not supported by the record and was
a suggestion of something that "may" help alleviate Keck's pain rather than an actual
limitation.[5] *Id.* The ALJ stated "In all other regards, Dr. Smeal's opinion is consistent with
the evidence as a whole . . . ." Tr. 22. The ALJ also noted that, although Dr. Smeal opined
that Keck would benefit from changing positions at least every 45 minutes by moving
around for 3-5 minutes, the ALJ found the claimant somewhat more limited in his ability
to sit. *Id.* The ALJ's RFC stated that Keck could only "sit for 20-30 minutes at one time,
after which he would need to stand for up to five minutes, but he would be able to remain
at the workstation and remain productive during that time." Tr. 19. In a separate portion
of the opinion, the ALJ noted that at the hearing Keck testified he was able to sit 20-30
minutes at a time, after which he needed to stand for at least five minutes. Tr. 20. The
ALJ did not further address Dr. Smeal's statement that "it would be best to walk and move
around for 3-5 minutes on each of these occasions." *See* Tr. 674.[6] However, Dr. Smeal
opined that Keck needed to change positions at least every 45 minutes. His statement
that "it would be best to walk and move around" represented what would be best for Keck

---

[5] Mr. Keck does not appear to contest the ALJ's treatment of Dr. Smeal's statement that reclining
while seated or lying down for a few minutes may provide some relief for symptoms. *See* Pl. Br., ECF No.
14, Page ID 743 ("it is not clear whether that was intended to be a work limitation").

[6] Mr. Keck also argues that the need for frequent breaks to walk or move around was consistent
with the opinion of the consultative examiner and the ALJ erred in rejecting Dr. Hollis's opinion that Mr.
Keck would need extra breaks. Pl.'s B., ECF No. 14, Page ID 748. However, the consultative examiner Dr.
Hollis stated only that "The patient may be able to tolerate some sort of very light duty with frequent rests
and/or breaks." Tr. 651. The ALJ found his opinion to be vague yet gave it weight to the extent it was
consistent with the RFC. Dr. Hollis's opinion does not a specific number of breaks, does not specify that
Mr. Keck would need to walk around during any breaks, and is overall not inconsistent with the ALJ's RFC.

as opposed to what he required. Thus, the ALJ did not err by not incorporating into the RFC Dr. Smeal's statement that it would be best for Keck to walk and move around.

### B. Weight afforded to Keck's subjective allegations of limitations.

"Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility." *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d1211, 1217 (8th Cir. 2001)).

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
>
> 2. the duration, frequency and intensity of the pain;
>
> 3. precipitating and aggravating factors;
>
> 4. dosage, effectiveness and side effects of medication;
>
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Id.* (quoting *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). "[A]n ALJ need not explicitly discuss each *Polaski* factor." *Id.* (quoting *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir.2005)). "An ALJ who rejects such [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." *Id.* (quoting *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir.2000)). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Id.* (quoting

*Pearsall*, 274 F.3d at 1218). The Court defers to the ALJ's evaluation of a claimant's credibility "provided that this determination is supported by 'good reasons and substantial evidence.'" *Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014) (quoting *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir.2006)).

Keck testified that he cannot perform his past job as a computer programmer because of his back pain. The ALJ acknowledged that Keck's symptoms included pain, numbness in the legs, and muscle spasms in the lower back, and that he reported these symptoms are present constantly but worsen with sitting or standing for long periods, changing positions, twisting, bending, and driving, and they improve with lying down and inactivity. Tr. 20. The ALJ also acknowledged that Keck testified that he was able to sit for 20-30 minutes at a time, after which he needed to stand for at least five minutes. Tr. 20,40. The ALJ noted that Keck takes hydrocodone for back pain, which causes some problems with balance and focus such that he does not drive after taking it. Tr. 20.

The ALJ stated that Keck "has described daily activities that are not limited to the extent one would expect given the complaints of disabling symptoms and limitations." Tr. 20. Keck argues that the ALJ erred in finding that his daily activities detracted from the credibility of his subjective complaints.

Specifically, the ALJ noted the following:

The claimant admits the ability to perform personal care tasks independently, such as bathing, dressing, personal hygiene, feeding, and toileting (Exhibit 4E). The claimant admits the ability to cook simple meals, shop, and drive (Exhibit 4E). In terms of household tasks, the claimant admits the ability to rinse dishes, load the dishwasher, do laundry, and vacuum (Exhibit 4E). When describing his daily activities, he reported that he wakes up, eats breakfast, showers, takes his medication, checks his email and Facebook, has lunch, watches television, eats dinner, and then spends time on the internet (Exhibit 4E).

20

*Id.* The ALJ also stated that

> While the claimant's ability to engage in these ordinary life activities is not itself conclusive proof that he is able to engage in substantial gainful activity, his capacity to perform these tasks independently is a strong indication that he retains the capacity to perform the requisite physical and mental tasks that are part of everyday work activity.

*Id.* The ALJ also stated that this indication is further supported by the objective medical signs and findings. Tr. 21. Specifically, the ALJ noted that many of the examinations showed normal gait and strength, negative straight leg raising, full range of motion, no sensory changes, no tenderness, and it was routinely noted that Keck was not in acute distress. Tr. 21-22. The ALJ also noted that following his surgery in March 2016, and subsequent office visit in April 2016, Keck "went for an extended period without office follow-ups, until April 2017, when he again reported low back pain." Tr. 21. The ALJ found that restricting Keck to performing the range of work described in the RFC adequately addressed the location, duration, frequency, and intensity of the claimant's alleged symptoms, as well as their precipitating and aggravating factors. Tr. 22.

"[A] person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." *Wagner*, 499 F.3d at 851 (quoting *Singh*, 222 F.3d at 453). "In evaluating a claimant's RFC, consideration should be given to the quality of the daily activities and the ability to sustain activities, interests, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities must also be considered." *Id.* (emphasis in original) (quoting *Leckenby v. Astrue*, 487 F.3d 626, 634 (8th Cir.2007)). "A claimant's allegations of disabling pain may be

21

discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications." *Id.* (quoting *Singh*, 222 F.3d at 453).

Keck argues that the ALJ relied on an exhibit prepared before Keck's symptoms significantly worsened, following physical therapy and his eventual back surgery, to determine Keck's activities. Although it is true the ALJ referred to the Daily Activity and Symptom Report prepared in November 2015, Keck's brief cites no evidence that he is no longer able to perform these activities. Instead, he argues the ALJ failed to properly assess his credibility, concluding his limited activities on good days were inconsistent with his subjective reports of limitations.

The Eighth Circuit has stated that a claimant's ability to perform "limited activities (with difficulty) on his good days is not inconsistent with his testimony that on his bad days, he cannot function at all. The ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work." *Ross v. Apel*, 218 F.3d 844, 849 (8th Cir. 2000). Keck testified that he does not like taking pain pills because he does not like the side effects so he tries to consolidate all of his errands, stating "if I've got to do something one day, like go to therapy, that's the day I go to the grocery store and get all my other stuff done for, you know, three, four, five, days. So because then I know when I get home, I'm going to be in pain . . ." and stated that he would then need to take pain pills for the rest of the day. Tr. 41. Keck also testified that the pain pills made him "really sleepy and groggy" and he would need to take them if he tried to sit for 20 to 30 minutes and then stand for five minutes and repeat that throughout the day. Tr. 40-41. Keck cited to no evidence that he was only able to participate in activities on good days or that his activities were further limited on bad days. Instead the evidence demonstrates

that he does many activities one day in order to avoid taking pain medication on multiple days.

Keck also argues that the ALJ is "not allowed to play doctor" by crafting his own RFC based on his interpretation of "no acute distress" and other medical findings. In support of this argument, Keck cites *Combs v. Berryhill*, 878 F.3d 642 (8th Cir. 2017). In *Combs*, the Eighth Circuit concluded the ALJ erred in relying on his own inferences as to the relevance of the notations in the treatment records of "no acute distress" and "normal movement of all extremities" when determining the relative weight to assign the opinion of the two reviewing physicians. *Id.* at 647. Unlike in *Combs*, here the ALJ's RFC was based on the opinion of the treating physician Dr. Smeal and not the ALJ's interpretation of ambiguous treatment notes. An ALJ can use objective medical evidence to support the decision to discredit a claimant's subjective complaints. *See Goff*, 421 F.3d at 792 (evidence that "[claimant] had a negative straight-leg raising test, no focal or motor deficits, and normal sensation and reflexes" was part of the evidence considered in credibility determination). Further, even assuming the ALJ erred in relying on the fact that treating physicians routinely noted Keck was in no acute distress, the ALJ gave other valid and supported reasons for discounting the extent of Keck's subjective complaints, such as his negative straight leg testing, pattern of treatment, and independent daily activities. *See Dodson v. Astrue*, 346 F. App'x 123, 124 (8th Cir. 2009) (affirming decision where "[e]ven assuming (without deciding) that the ALJ erred in relying on [claimant's] reported daily activities as a reason to discredit her . . . the ALJ gave other valid and supported reasons for discounting the extent of [claimant's] subjective complaints").

The ALJ considered the relevant factors and discounted Keck's credibility based not only on his consistently and independent ability to perform ordinary life activities but also based on his medical evidence and treatment history. *See* Tr. 21-23. Thus, the ALJ did not err in discounting Keck's statements concerning intensity, persistence and limiting effects of his symptoms.

Keck failed to demonstrate that in addition to needing 3-5 minute periodic breaks to move from a sitting to a standing position, he also required the opportunity to walk around. The ALJ did not err in the weight he gave to Dr. Smeal's opinion, Dr. Hollis's opinion, or Keck's allegations of limitations; did not fail to explain the weight given to the evidence; and did not err in excluding from Keck's RFC the opportunity to walk and move around during periodic breaks from sitting. The ALJ's credibility determination with respect to Keck was supported by valid reasons and substantial evidence. Thus, the ALJ's decision to deny benefits, which is supported by substantial evidence in the record, will be affirmed.

## II. Constitutionality of the ALJ's appointment as an inferior officer.

"As of 2017, [ALJs] in the Social Security Administration [(SSA)] were not appointed by the head of the agency, but rather by lower-level officials." *Davis v. Saul*, No. 18-3422, 2020 WL 3479626, at *1 (8th Cir. June 26, 2020). On June 21, 2018, the Supreme Court decided that administrative law judges of the Securities and Exchange Commission are "Officers of the United States" who must be appointed by the President, a court of law, or a head of a department. *Lucia v. SEC*, ––– U.S. ––––, 138 S. Ct. 2044, 2051, 2055 (2018). The Court stated that "one who makes a timely challenge to the

constitutional validity of the appointment of an officer who adjudicates his case is entitled to relief." *Id.* at 2055 (internal quotation and citation omitted).

Keck argues that the ALJ that decided his case "was an inferior officer that was not properly appointed under the Appointments Clause, which warrants the ALJ's denial of benefits be vacated and [Keck's] claim remanded for a new hearing before a new, constitutionally appointed, ALJ." Pl. Br., ECF No. 14, Page ID 732. The Commissioner argues that because Keck failed to raise his Appointments Clause challenge at any point in the administrative process his challenge is untimely, and he has forfeited his Appointments Clause claim. Def. Br., ECF No. 18, Page ID 793. Keck argues that exhaustion of his Appointments Clause argument was not required and would have been futile. Pl. Br., ECF No. 14, Page ID 752-53.

The Eighth Circuit recently addressed the issue of whether failure to raise an Appointments Clause challenge before the SSA resulted in forfeiture. *Davis*, 2020 WL 3479626, at *1. In *Davis*, the claimants argued that "constitutional claims need not be exhausted, that exhaustion of this particular constitutional challenge would have been futile, and that the court should exercise its discretion to waive any applicable exhaustion requirement." *Id.* at *3. The Eighth Circuit concluded that exhaustion was required, and this was not "'one of those rare cases in which we should exercise our discretion' to consider a non-exhausted claim." *Id.* (quoting *Freytag v. Comm'r*, 501 U.S. 868, 879 (1991)). The court also rejected the futility argument stating

> Repetition of [an] objection . . . might lead to a change of policy, or, if it did not, the [agency] would at least be put on notice of the accumulating risk of wholesale reversals being incurred by its persistence. *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952). Even if an individual ALJ was powerless to address the constitutionality of her appointment, the agency head—alerted to the issue by claimants in the adjudicatory

> process—could have taken steps through ratification or new appointments
> to address the objection.

*Id.* (alterations in original). Other circuit courts have disagreed on whether exhaustion of

the Appointments Clause issue before the SSA is required. *Compare Carr v. Comm'r*,

Nos. 19-5079, 19-5085, —— F.3d ——, 2020 WL 3167896, at *8 (10th Cir. June 15, 2020)

(exhaustion required), *with Cirko v. Comm'r*, 948 F.3d 148, 159 (3d Cir. 2020) (exhaustion

not required).

Like the claimants in *Davis*, Keck did not present his Appointments Clause claim

before either the ALJ or the Appeals Council. He attempts to distinguish his case from

prior cases where all the agency action, or potential action, occurred before EM-18003[7]

was issued and before Berryhill's lapse in authority, between November 2017 and April

2018, that led the SSA to lack a Department Head that could provide a remedy for an

Appointments Clause challenge. Similar arguments have been considered and rejected

by other judges in the Eighth Circuit. *Hinds v. Saul*, No. 18-CV-3065-CJW, 2020 WL

3120349, at *20 (N.D. Iowa Feb. 3, 2020), *adopted by*, 2020 WL 1043448 (N.D. Iowa

Mar. 4, 2020) ("nothing stopped Claimant from raising the issue during the administrative

process and preserving it for appeal or attempting to raise it in an amended appeal since

---

[7] On January 30, 2018, the agency's Office of General Counsel issued an emergency measure warning ALJs that they might receive Appointments Clause challenges and instructed them not to "discuss or make any findings related to the Appointments Clause issue," because the "SSA lacks the authority to finally decide constitutional issues such as these." Soc. Sec. Admin., EM-18003*: Important Information Regarding Possible Challenges to the Appointment of Administrative Law Judges in SSA's Administrative Process* (2018). The agency directed the ALJs to acknowledge when the issue had been raised. *Id.*

On June 25, 2018, the SSA's Office of Hearing Operations issued a revised emergency measure. Soc. Sec. Admin., EM-18003 REV: *Important Information Regarding Possible Challenges to the Appointment of Administrative Law Judges in SSA's Administrative Process* – UPDATE (2018). This measure continued to instruct ALJs to acknowledge, but not to address, challenges based on the Appointments Clause. *Id.* The Appeals Council was instructed not to "acknowledge, make findings related to, or otherwise discuss the Appointments Clause issue." *Id.*

*Lucia* was decided three months prior to the Appeals Council's decision in her case"); *Kersh v. Saul*, No. 18-CV-2067-CJW, 2020 WL 3120990, at *14 (N.D. Iowa Feb. 25, 2020), *adopted by*, 2020 WL 1244864 (N.D. Iowa Mar. 16, 2020) (despite EM-18003 and Berryhill's lapse of authority, "[n]othing prevented Claimant from raising this issue in her appeal or attempting to raise it in an amended appeal once *Lucia* was announced."). This Court similarly finds it without merit.

EM-18003 was in effect at the time of Keck's hearing in March 2018, the ALJ's decision in April 2018, and Keck's request for review which occurred prior to May 15, 2018. *See* Tr. 1, 7, 13. Nothing contained in EM-18003 prevented Keck from raising the Appointments Clause challenge to the ALJ and Keck's arguments do not explain his failure to raise the issue to the Appeals Council. In fact, EM-18003 REV 2[8] which was in effect prior to the Appeals Council's August 10, 2018, decision, provided that "In those matters where a timely Appointments Clause challenge to an ALJ decision issued prior to July 16, 2018 is raised to the Appeals Council in a proper request for review, the [Appeals Council] will grant review and issue a decision or order remand, as appropriate."

Keck argues that the Commissioner's need to issue Social Security Ruling 19-1p, 2019 WL 1324866 (Mar. 15, 2019) is an indication that the Appeals Council is not granting relief as directed in EM-18003 REV 2. In support, Keck cites to a blog written by an attorney indicating that as of April 23, 2019, he has heard of no cases where the Appeals Council rewrote the ALJ's decision to "skirt *Lucia*" and only one *Lucia* remand and in that

---

[8] EM-18003 REV 2 was issued on August 6, 2018, and announced that on July 16, 2018, the agency's Acting Commissioner ratified the appointment of all ALJs, to address any Appointments Clause questions. Soc. Sec. Admin., EM-18003 REV 2: *Important Information Regarding Possible Challenges to the Appointment of Administrative Law Judges in SSA's Administrative Process – UPDATE* (2018).

case it "looked like a case that was going to be remanded anyway." Charles T. Hall, *What's Going On At The Appeals Council With The Lucia Cases?,* SOCIAL SECURITY NEWS BLOG (Apr. 23, 2019, 8:49 AM), https://socsecnews.blogspot.com/2019/04/whats-going-on-at-appeals-council-with.html; Charles T. Hall, *First Lucia Remand*, SOCIAL SECURITY NEWS BLOG (Apr. 8, 2019. 3:25 PM) https://socsecnews.blogspot.com/2019/04/first-lucia-remand.html. The SSR 19-1p states only that it was issued "to explain how the Appeals Council will adjudicate appeals in which the claimant timely raises an Appointments Clause challenge to the authority of the ALJ who decided or dismissed a claim." The Court is not persuaded that the information cited by Keck demonstrates that his raising the issue would have been any more futile than the requests of the claimants considered, and rejected, by the Eighth Circuit in *Davis*.

Thus, for the foregoing reasons, the Court concludes Keck has forfeited his Appointments Clause challenge by failing to raise it during his administrative proceedings.

## CONCLUSION

For the reasons stated above, the Motion for an Order Reversing Commissioner's Decision, ECF No. 13, will be denied, and the Motion to Affirm Commissioner's Decision, ECF No. 17, will be granted. Accordingly,

IT IS ORDERED:

1. The Motion for an Order Reversing the Commissioner's Decision, ECF No. 13, filed by Plaintiff Jerry R. Keck, is denied;

2. The Motion to Affirm Commissioner's Decision, ECF No. 17, filed by Defendant Andrew Saul, is granted;

3. The Commissioner's decision is affirmed;

4.  The appeal is denied; and

5.  A separate judgment will be entered.

Dated this 9th day of July 2020.

BY THE COURT:

s/Laurie Smith Camp

Senior United States District Judge